(No. 14620.—Judgment affirmed.)

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, vs. CLINTON BOUCHER, Plaintiff in Error.

*Opinion filed June 21, 1922.*

1. CRIMINAL LAW—*what may be considered by jury in determining truth from conflicting testimony.* Where the testimony is conflicting and the jury are required to decide as to the credibility of the witnesses in reaching a verdict, they may consider not only the actual words used by the witnesses but their appearance and conduct on the witness stand, their interest in the case, the candor with which they testify, the accuracy of their observation, their opportunities of knowledge and the circumstances surrounding the occurrence to which they testify.

2. SAME—*when Supreme Court will not reverse judgment of conviction.* The Supreme Court will not reverse a judgment of conviction on the ground that it is contrary to the evidence unless it clearly appears that there is a reasonable doubt of the defendant's guilt, and it cannot be said that there is a reasonable doubt merely because the evidence is contradictory or because more witnesses testify in favor of the defendant than in favor of the prosecution.

WRIT OF ERROR to the Circuit Court of Franklin county; the Hon. J. C. EAGLETON, Judge, presiding.

G. A. HICKMAN, and W. C. CHOISSER, for plaintiff in error.

EDWARD J. BRUNDAGE, Attorney General, ROY C. MARTIN, State's Attorney, and FLOYD E. BRITTON, for the People.

Mr. JUSTICE DUNN delivered the opinion of the court:

On an evening in December, 1920, the drug store of Bert Fox, in Zeigler, in Franklin county, was entered about seven o'clock by two or more men, who robbed the cash register of about $70. At the May term of the circuit court,

Clinton Boucher and Charlie Boucher, brothers, were indicted for the robbery. They were tried at the November term. Charlie Boucher was acquitted and Clinton Boucher was found guilty. He was twenty-five years old and was sentenced to imprisonment in the Illinois State Reformatory. This writ of error is prosecuted to reverse the judgment on the single ground that it is not sustained by the evidence.

The People's case rested upon the identification of the plaintiff in error. The commission of the crime was shown by the testimony of George Betts, the clerk who was in charge of the store. He testified that about half an hour before the robbery Charlie Boucher came into the store to buy a small vial of perfume and asked where the "big doc" was, referring to another clerk in the store, and Betts told him that he had gone home for a few days. About a half hour later another man, who was neither of the defendants and whom Betts did not know, came in and asked for a dime's worth of bismuth. Betts was behind the counter in the front end of the store, and when he turned to get the bismuth the supposed purchaser placed something which he held in his hand against Betts' back and said to him, "Put them up and walk around behind the prescription case." Betts put his hands up and walked behind the prescription case, where the man, with the assistance of another who had come in, blindfolded Betts, tied his hands behind him, tied his ankles together, took him into the rear of the store and laid him, face downward, on a bed. Betts did not know how many persons there were, but there were more than one. While he was lying there he heard the men taking the change out of the cash register and heard the jingle of the money. Back of the store were some rooms partitioned off by a beaver board partition extending only part way to the ceiling. Beyond this partition Mr. and Mrs. Patterson lived. Betts felt someone step over him and go through this partition. He did not hear anything said by

the robbers until just before they were leaving, when one of them said, "Hurry up, Clint," though Betts was not sure of the name.

Goldia Patterson lived with her husband in the rooms back of the store and testified that there was an opening between the drug store and their rooms. The door was nailed up. About 7:15 in the evening of the day of the robbery she heard the noise and opened the door to the bedroom, which was the next room to the drug store. Clinton Boucher, the plaintiff in error, whom she did not know and had never seen, was in the bed-room and had pulled the partition down. He pointed a gun in her face and told her to go back. She asked him what he wanted, and he again told her to go back, and when she asked him what he meant he repeated his command and she went back. There was no light burning in the room, but it was not very dark and she could see him distinctly. There was a light burning in the drug store and the partition extended but little more than half way to the ceiling. He had a revolver in his hand, which he pointed at her. She saw him after that in the Benton jail. There were several there with him and she was able to identify him in the jail. The date of the robbery was not fixed by the evidence for the People except that it was in December, 1920. Mrs. Patterson testified that the man wore a brown suit and a brown hat.

The defense was an alibi. Weldon Parker testified that he lived at Herrin on December 7, 1920, and saw the plaintiff in error there on that evening. The plaintiff in error got Parker, who was driving a service car at that time, to take him to Hurst about five o'clock. He took him and they arrived at Hurst about six o'clock, where Parker left Boucher at the latter's brother's. There was a girl with him and Parker did not see him any more that night.

Frank Boucher, a brother of the plaintiff in error, lived at Hurst and testified that Clinton came to his house on the evening of December 7, while his wife was getting

supper, in the neighborhood of six o'clock, and had supper there. Marie, whom Clinton married on December 17, was with him, and Frank remembered the date because Clinton said that he and Marie were going to get married on the 17th and spoke about that day as being the 7th. Frank testified that Clinton wore a green hat and a suit of some kind of novelty goods, by which he said he meant a suit with about seven or eight different colors; that after supper they sat around and talked awhile, and the plaintiff in error said he had better be going,—he wanted to catch a train. It was between seven and eight o'clock when they left and he did not know where they went. Frank lived ten miles by rail from Zeigler.

Pearl Boucher, Frank's wife, testified to the same thing,—that plaintiff in error came there about six o'clock in a service car and left right after supper to catch a train for Herrin; that his intended wife was with him and they were going to Herrin from there.

T. O. McGrill, a locomotive fireman, testified that he had worked for the Missouri Pacific Railroad Company for four years and stayed at the Y. M. C. A.,—a railroad eating house at Bush; that he saw the plaintiff in error on December 7, 1920, about 8:30 in the evening, in the depot at Bush. His wife was with him. The depot is used by both the towns of Hurst and Bush. The date was fixed in his mind because he wanted to see the plaintiff in error about an automobile accident, and he talked with him about that at the depot for ten or twelve minutes. The plaintiff in error went to Herrin from there. McGrill saw him get on the train.

The plaintiff in error testified that he lived at Hurst and that Weldon Parker drove him and his wife on December 7 from Herrin to Hurst to his brother's, where they arrived about six o'clock and stayed until 7:40; that he went from there to the home of V. L. Leckner, a coal miner, whom he had known and worked with for about two years,

and saw him and his wife at that time, but they could not be present to testify at the trial because they were subpœnaed to attend a murder trial in Murphysboro. After staying at Leckner's house fifteen or twenty minutes he went to the Iron Mountain depot at Bush,—about three-quarters of a mile from Leckner's. His wife was with him and he talked to McGrill until the train came, and from there went to Herrin on the Missouri Pacific passenger train, arriving at Herrin about ten o'clock. He was afterward married to his wife on December 17. He had been married to her before. He said that the closest point he was to Zeigler that night was ten miles by rail and twelve miles by road and that he was not in the drug store. He denied all connection with or knowledge about the robbery. He testified that Mrs. Patterson came to the jail while he was lying on a cot reading a book, and she passed by him and went around the jail. Mr. Martin said, "Is that him?" and she said, "I do not know." Martin said, "Stand up, so you can look good," and asked, "Have you ever seen him before?" She said, "I think I saw him in Zeigler," and the plaintiff in error said, "No, you're mistaken," and that is all that was said.

Neither the plaintiff in error nor the People introduced any evidence fixing the exact date of the crime, but the co-defendant, Charlie Boucher, testified that he went into the drug store where Betts was working about 6:30 in the evening of December 7, 1920, and bought a bottle of perfume, and that later the same evening he heard the drug store had been robbed.

George Manis testified that Charlie Boucher was in the candy kitchen, where Manis was employed, on the evening of December 7, about seven o'clock; that he heard the drug store had been robbed that evening about seven o'clock. Charlie was in the candy kitchen at that time. Doc King testified to substantially the same thing.

The sheriff testified that Mrs. Patterson was in the jail at the time testified to by her and that he did not give her any assistance.

The evidence of the prosecution is sufficient to sustain the conviction. If Mrs. Patterson is not mistaken the defendant is guilty. The testimony introduced in behalf of Charlie Boucher seems to fix the date of the crime on December 7, and if the testimony of the defendant and of the witnesses in his behalf is true, then Mrs. Patterson is mistaken. No reason appears for the plaintiff in error's taking this ride from Herrin to Hurst to have supper at his brother's on this particular evening and immediately afterward going back by train to Herrin. Only one witness for the prosecution has identified the plaintiff in error, while four witnesses besides himself have testified to his alibi. In such a condition of the evidence it is the special function of the jury, where the facts testified to cannot be reconciled, to determine what is the real truth of the matter. The determination of this question involves a consideration, among other things, not only of the actual words used by the witnesses but of their appearance and conduct on the witness stand, their interest in the case, the candor with which they testify, the accuracy of their observation, their opportunities of knowledge, and the circumstances surrounding the occurrence to which they testify. The court will not reverse a judgment in a criminal case upon the ground that it is contrary to the evidence unless it clearly appears that there is a reasonable doubt of the defendant's guilt, and it cannot be said that there is a reasonable doubt of the defendant's guilt merely because the evidence is contradictory or because more witnesses testify in favor of the defendant than in favor of the prosecution. In such situations it is the most important function of the jury and their peculiar province to determine the truth of the case, and the opportunity which they have of seeing and hearing the witnesses during their examination and cross-examina-

tion is clearly superior to that of a court of review, which has before it only, a record of the words used by the witnesses. We cannot say that the jury were not justified in being convinced, beyond a reasonable doubt, of the defendant's guilt, and the judgment will therefore be affirmed.

*Judgment affirmed.*