THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* JAMES GENTILE, Plaintiff in Error.

*Opinion filed June 22, 1927—Rehearing denied October 11, 1927.*

1. CRIMINAL LAW—*when conviction resting on identification of defendant will not be set aside.* It is for the jury to decide the truth of the matter between evidence tending, on the one hand, to identify the defendant as a participant in the crime charged, and, on the other, to establish an alibi; and a reviewing court will not set aside a conviction merely because the evidence is contradictory or because more witnesses testify in favor of the defendant than in favor of the prosecution, but it must be satisfied that there is a reasonable doubt of guilt and that the verdict is contrary to the weight of the evidence.

2. SAME—*when improper statement of witness in regard to co-defendant cannot be regarded as prejudicial.* An improper statement of a witness referring to a co-defendant as having been in

the penitentiary cannot be regarded as prejudicial to another defendant whose case rests entirely on evidence tending to establish an alibi, where none of the defendants testified, where there is no evidence tending to show that they had ever known or had any connection with one another prior to the offense charged, and where the case of each defendant rests upon his own separate evidence of an alibi.

3. SAME—*when reviewing court will not grant a new trial for alleged newly discovered evidence.* Where a conviction is obtained on contradictory evidence a new trial will be granted where alleged newly discovered evidence, set forth in affidavits, is not cumulative but is of such character as to convince a court of review that the ends of justice require a further examination of the case, but a new trial will not be granted by a reviewing court, notwithstanding the contradictory evidence, where the alleged newly discovered evidence is merely cumulative, is not conclusive and probably would not produce a different verdict.

WRIT OF ERROR to the Criminal Court of Cook county; the Hon. JOHN P. McGOORTY, Judge, presiding.

ROCCO DeSTEFANO, (ELWYN E. LONG, of counsel,) for plaintiff in error.

OSCAR E. CARLSTROM, Attorney General, ROBERT E. CROWE, State's Attorney, and JAMES B. SEARCY, (HENRY T. CHACE, JR., and EDWARD E. WILSON, of counsel,) for the People.

Mr. JUSTICE DUNN delivered the opinion of the court:

James Gentile was convicted of robbery while armed with a deadly weapon and prosecutes this writ of error. He was indicted jointly with Joseph Leopold, Thomas Shupe, William White and James Sammon. Leopold was granted a separate trial and the other defendants were tried together. Shupe and Gentile were convicted and White and Sammon were acquitted.

The robbery occurred at noon on March 5, 1926, at the office of the tractor works of the International Harvester Company, in Chicago. The tractor works pay-roll

for that day, in bills, silver, nickels and pennies, amounting to $80,421.47, had been placed in envelopes ready for delivery to the individual employees, and trays containing the envelopes had been placed in the pay-box, about 30 by 23 by 15 inches in size, weighing, with its contents, about 175 pounds. The box was locked, sealed and tagged. It was then delivered at the office of the company, at 606 South Michigan avenue, to Brink's Express and was conveyed in an armored car to the tractor works, at 2600 West Thirty-first boulevard, where it was delivered about half-after eleven o'clock to Johnson, the cashier. Immediately after signing for the delivery of the box Johnson went out, leaving it in his office, the doors of which were locked. Several persons participated in the robbery, but the exact number, the particular acts of each and the precise order of events is difficult to ascertain with certainty from the testimony of the witnesses for the prosecution who were present. None of the defendants testified and no witnesses were offered by them as to the robbery, though the plaintiff in error produced witnesses to establish an alibi. The action began with the entry of two men at the front entrance of the tractor works, one of whom was armed with a shot-gun and the other with a revolver. They presented these weapons at the watchman who was acting as pay-roll guard and commanded him to back up. He did so, passed through a gate which was there, they following him, and backed up the stairs to the sixth step from the top. Other armed men appeared on the scene, and one of them jumped over the railing in which was the gate through which the guard had passed. The guard shot at the man with the shot-gun, who returned the fire and several of the robbers fired shots but no one was hit. The guard went up on the second floor and tried to get out on the roof of the machine shop but could not. He came down and the robbers were gone. They had threatened with their weapons the employees, men and women, who were present, had ordered them to

hold up their hands or lie on the floor, had broken through the door into the office where the box was and carried it out to the street, where two cars were standing,—a Cadillac and a Chrysler,—had got in the cars with the pay-box and its contents and were gone. The Chrysler car belonged to the plaintiff in error.

Gentile was identified by two witnesses as one of the men engaged in the robbery. Malcom Kennedy, a clerk in the storage department, was working in the receiving room. He testified that he looked out the window and saw at the gate a man with a gun presented to the stomach of the watchman. The man disarmed the watchman, forced him back into the shanty and closed the door. This man was Joe Leopold, one of the defendants. Kennedy then went to the doorway leading to the interior of the office. He saw a man there standing between two of the desks, who walked back and forth a couple of times. Holland, who was sitting at his desk, put his hands up. Kennedy heard someone coming and ducked down behind a radiator. He started to get up off the floor and heard two shots fired. He looked again and saw this man standing with a gun in his hand. There was quite a bit of firing going on. This man came back, pointed his gun northeast and Kennedy ran out the door and out into the yard, after which he saw no more of any of the men. This man, Kennedy said, was Gentile.

Joseph J. Ballard, production clerk, was in the office at the time and testified that he heard a commotion at the main entrance to the office and looking around saw two men with their hands in the air. Ballard was covered by a revolver by a man who had on a gray Fedora hat of light color, a dark-blue coat and wore glasses, who told Ballard to put his hands in the air. He was standing right at the corner of Ballard's desk, three or four feet away from him, and Ballard identified him in the court room as the plaintiff in error. He had a blue-steel revolver in his

hand and said, "Where is the money?" and a few minutes
after he told Ballard to hold his hands up he told him to
go up against the wall. Ballard heard an order to lie down,
and he obeyed that order. The last he saw of Gentile was
at his desk. After that he heard glass breaking in the
doors of the conference room, a moment later a shot was
fired, and a few minutes after someone said, "Let him have
it!" and the fire was directed away from the place where
Ballard was.

In support of his defense of an alibi, James P. Mc-
Manus, G. E. Webber and A. P. Gudgeon testified for the
plaintiff in error. McManus was a friend of Gentile and
they had gone to school together as boys. McManus bought
a new Chrysler from the Marquardt Motor Company on
March 4, trading in his old car. The new car had been de-
livered to him and the company had promised to put on
it the winter front from the old car. The next morning,
about 9:45, McManus saw Gentile and sent him to the Mar-
quardt Motor Company, 3212 Jackson boulevard, to have
the winter front put on, but he returned in about fifteen
minutes without having it done. The two together then
went to the motor company, arriving about noon. Web-
ber, the mechanic, and George Reid, washer, were just go-
ing out to dinner. McManus asked them to put the win-
ter front on, but Webber hesitated, and McManus said he
would buy their dinners if they would do it. Webber, with
Reid's assistance, proceeded to put on the winter front,
taking about thirty minutes for that work, while McManus
and Gentile waited. McManus then asked where he could
get a double wiper, and Webber referred him to the Uni-
versal Auto Supply Company, at 4011 Washington boule-
vard. McManus and Gentile drove there from the Mar-
quardt Motor Company. Gudgeon, who was the assistant
manager, testified that he saw Gentile and McManus at the
counter of the store about 12:30. McManus asked for a
double windshield-wiper. He bought two. Gudgeon had

never seen either of the men before but identified Gentile
as one of them.   He made a record of the sale, and about
the middle of the month McManus called and at his sug-
gestion Gudgeon looked up the record which he had made.
Webber, the mechanic at the Marquardt Motor Company,
testified that Gentile drove in there with McManus' car be-
tween nine and ten o'clock in the morning of March 5 and
remained there ten or fifteen minutes.   He came back at
noon with McManus to have the winter front put on the
car.   Webber was just going to dinner, but he remained
and did the work, taking probably a half or three-quarters
of an hour to finish it. ' The plaintiff in error was there
in the car and stayed in the car while the work was being
done.   At that time Webber did not know that Gentile's
name was Gentile but knew him as Pommy.   In rebuttal,
three police officers testified the reputation of McManus for
truth and veracity was bad and they would not believe him
on oath.

The plaintiff in error argues that the identification by
Kennedy and Ballard was of doubtful value.   They were
present when the crime was committed.   Whether their
exciting experience would tend to impress upon their mem-
ory more distinctly the identity of the actors in the scene
or to make their recollection more uncertain and indistinct
was a question to be determined by the jury, and no doubt
that question was fully presented to them in the arguments
of counsel at the trial.   Gentile was taken into custody on
March 15 and was taken to the tractor works, together
with others, for identification and was there identified by
Kennedy.   He knew that Gentile's car was used in the rob-
bery and that he was probably a foreigner, and it is argued
that while Gentile was presented to him among others, yet
it was done under such circumstances that he would prob-
ably identify him from the descriptions which he had re-
ceived rather than from his memory of his appearance.
The same argument applies to the testimony of Ballard,

who identified Gentile at the police station. These arguments, and others which are presented in the brief for the plaintiff in error, were proper to be considered by the jury, to whom they were no doubt presented in the argument with great force, but none of them are conclusive. It can not be said that there is a reasonable doubt of the identification of a defendant because only one or two witnesses testified to his identity, even though the witnesses had only seen the defendant one time, and that under circumstances of excitement, distraction, danger, fear or other emotion. All these circumstances must be taken into consideration, but a reviewing court cannot hold the identification insufficient merely because the evidence is contradictory or because more witnesses testified in favor of the defendant than in favor of the prosecution. (*People* v. *Boucher,* 303 Ill. 375.) The testimony of Ballard and Kennedy on the one side, and of Webber, McManus and Gudgeon on the other, is irreconcilable. If Webber, McManus and Gudgeon are right then Ballard and Kennedy are mistaken. Webber testified that Gentile sat in McManus' car during the whole time Webber was working on it. His attention was centered on McManus' work and only incidentally on the man in the car. Gudgeon only saw Gentile twice: once when he made the sale to McManus and again on the day he testified. His attention, of course, was given to the purchaser and only incidentally to his companion. The whole attention of Ballard and Kennedy would naturally be centered on the man with the gun. The fact that McManus was the person with whom Webber and Gudgeon were transacting business and not the companion who happened to be with him, that both McManus and Gentile were unknown to Gudgeon on March 5, the bad reputation of McManus for truth and veracity, were circumstances in the case which were certainly entitled to consideration in determining which witnesses were entitled to the most credit, as well as the facts that Ballard and Kennedy were both

laboring under excitement during the robbery, that their identification of Gentile was after it was known his car was used in the robbery, that his name indicated that he was of foreign extraction and of foreign appearance, and that neither of them on the day of the robbery gave a description of Gentile as a man engaged in it. It is the special province of the jury, where the facts cannot be reconciled, to determine the truth of the matter, and where there are circumstances which may tend to discredit testimony to prove an alibi, the jury may, notwithstanding the evidence that the defendant was not at the place where the crime was committed at the time it was committed, find him guilty. (*People* v. *Kemming*, 311 Ill. 50; *People* v. *Hildebrand*, 307 id. 544.) The court will not set aside a verdict of guilty as being contrary to the weight of the evidence unless it is clear that there is a reasonable doubt of the defendant's guilt, where the case depends merely upon the credibility of witnesses on one side testifying to an alibi and on the other as to the identification of the defendants.

During the examination of William Shoemaker, chief of detectives, who had testified as to the circumstances of the arrest of White on the morning of March 23 at the Roadside Inn and the arrest of Shupe at the same place in the evening of the same day, and the finding of two automatic pistols and $805.34 on the person of Shupe and to a conversation with Shupe at that time, the following occurred:

Q. "Did you say anything further to the defendant Shupe and did he make any reply?

A. "I says, 'Well, Tommy, you may as well tell us what you were doing after you got out of the pen.'

Mr. Jennings: "Now, your honor, that is the trouble with those fellows. Now, I don't know what to ask you to do. Of course, I object, and ask that the jury be—

The court: "Of course. First I will instruct the jury that the testimony just submitted,—just given by the witness,—is highly improper, and you are absolutely to dis-

regard it; something that the law does not intend that a witness shall say; anything of that kind prejudicial to the defendant. And you should, I say, wholly disregard it. You may retire."

Out of the presence of the jury a motion was made on behalf of Shupe that a juror be withdrawn and the case against him continued. This was denied and an exception allowed to all the defendants. A motion to strike out all the testimony on behalf of each of the defendants was then made and denied, and the court told the jury, "The last statement of the witness is stricken out as tending to be highly prejudicial and improper and has no place in this case." The jury would infer from the statement of the witness that Shupe had been imprisoned in the penitentiary upon a conviction of crime, and it is argued that this was not only prejudicial to him but to all the other defendants in the case. This is on the theory that it would become known to the jury that the other defendants were on trial with a felon, and also that the jury would know that Shupe had not testified, and the reason he had not testified was because he was in the penitentiary and would not dare to. Having gone this far, the jury might then go a step farther and conclude that if none of the remaining defendants testified, they, too, must have been in the penitentiary. This is going a long way. The defense of each of the defendants was an alibi, and the jury were instructed that they should consider each defendant separately and find such a verdict in each individual case as the evidence warranted as if each defendant had been tried separately. There was no evidence tending to show that either of the defendants had ever known either of the others. The evidence connecting each of them with the crime was separate and the defense of each was wholly disconnected from that of the others. It is impossible, under these circumstances, that the character of one of the defendants could affect the case of the others or that any juror could think so, and the argument

that the jury would not only infer that Shupe had not tes-
tified because he had been in the penitentiary and did not
dare to testify, and that having gone so far they would go
a step farther and conclude that if none of the remaining
defendants testified, they, too, must have been in the peni-
tentiary, is an unjustifiable reflection on the intelligence of
the jury.

The plaintiff in error moved for a new trial and in ar-
rest of judgment, but his motions were overruled and he
was sentenced in accordance with the verdict. At the same
term he moved to vacate the judgment and for a new trial.
In support of this motion he filed his own affidavit and affi-
davits of Victor Musso, George Reid and Anthony J. Mer-
curio. In his affidavit he stated that he was married, liv-
ing with his wife and child at 1512 Washburn avenue, next
door to his mother, was employed as a chauffeur and owned
a Chrysler car, which he had bought from the Marquardt
Motor Company about May 25. The affidavit then stated
the same facts in regard to his actions at the time of the
robbery as testified to by his witnesses. It stated that he
afterward drove around with McManus in the new auto-
mobile. About four o'clock he read of the crime in a
newspaper, from which he learned that his car had been
used in the robbery. He had parked his car that morning
on Arcade place, and upon returning there found that it
had been stolen. He called his mother on the telephone
and learned from her that police officers had been inquiring
for him. He returned home about midnight, where he bar-
ricaded himself and remained with his wife and child for
nearly ten days for fear that his presence on the street
would result in his arrest and unlawful detention. He then
sought the advice of an attorney, in accordance with which
he surrendered to the police on March 15. He was taken
by the police to the tractor works, where he was forced to
stand against the wall, turn around, put on a Fedora hat
and glasses, and do various things to fix in the minds of

the employees present whether he was there on March 5 or not. After much twisting and turning someone said that he was one of the men, and someone called his name. He protested his innocence and said that the employee was mistaken and someone had coached him to identify the plaintiff in error,—that it was impossible to pick him out otherwise; but he was told to shut up. On the preliminary hearing Kennedy had identified Leopold and stated that he could not identify anybody else; that Ballard, when he identified the plaintiff in error, was laboring under the same undue influence as Kennedy; that the plaintiff in error never saw either of them in his life until March 15; that he gave no permission to anyone to use his car in the robbery; that he had only a slight acquaintance with Shupe and never knew White or Sammon; that he had no part in the robbery and received no part of its proceeds. The affidavit stated that the plaintiff in error did not testify at the trial because he feared he was going to be railroaded to the penitentiary by the police; that he never wore a Fedora hat or glasses or a dark-blue coat and did not have a blue-steel revolver on March 5; that he is of the same height, weight, complexion and appearance as Joe Leopold, Victor Musso and many others who were brought to the detective bureau for identification; that he has been confined in jail since March 15 and has been without funds, and if a new trial were granted he would prove his innocence by presenting such newly discovered evidence as he had been able to gather.

Victor Musso in his affidavit stated that he was of the same height, weight, nationality and complexion as the plaintiff in error; that he was under arrest as one of those who had committed the robbery, and on March 8 was identified by two men whose names he did not know and was held in custody for nearly a day and a half, but was released after the facts of his alibi had been investigated.

George Reid was the porter who assisted Webber in putting the winter front on McManus' car. His affidavit set out the same facts to which the witnesses for the plaintiff in error had testified and stated that he did not know the name of the man who was with McManus, and after the robbery he was questioned by police officers as to whether a man whose name he understood to be Gennon or Genning had been at the garage on March 5, and he stated that Gennon or Genning had not been there; that afterward he learned that the officers had asked about Gentile and not Gennon or Genning. He went to the office of the State's attorney and insisted that his statement be corrected and that he be permitted to see Gentile to determine whether or not he was the man who had been at the garage with McManus, but permission was refused. He was told by some of the officers that he did not have to appear until called, and that as a result he talked with no one about the case until after the conviction of Gentile. He was told a number of times that if he testified in behalf of Gentile he would be sent to jail. On July 24, 1926, he was given an opportunity at the county jail to see Gentile for the first time after March 5, and identified him as the man who was with McManus at the garage on March 5. This was after Gentile's conviction.

Mercurio stated that he was an attorney employed by Gentile's attorney to investigate the facts in regard to Gentile's presence at the Marquardt service station on March 5. He called at the station and learned that Webber was then employed next door. Webber informed him that a colored porter had helped in adjusting the winter front. Webber did not know his name or address. With a letter of introduction from Gentile's attorney, Mercurio called again at the service station and inquired of Marquardt for information concerning the trading of cars by McManus, the repair work done on March 5, the name and address of the porter, and whether he could interview the porter if he was

present, but Marquardt declined to give him any information. Mercurio tried to see the porter in order to talk with him, but could not get into the rear of the shop because he had not Marquardt's permission. It was not until July 9, after the verdict, that he learned the name of the porter was George Reid.

These affidavits do not show the discovery of any new evidence since the trial or the exercise of reasonable diligence to procure it before the trial. The facts stated in the affidavit of the plaintiff in error were all known to him at the time of the trial and might have been testified to, but he deliberately chose not to testify. He neither denied nor explained anything nor offered to. The affidavit of Musso indicated no more than that in his general appearance he looked like the plaintiff in error; that because of this general resemblance and from the description given by the police he was arrested for the offense and was identified by two persons as one of those engaged in the robbery, but that this identification was. found to be erroneous and he was released. Whatever knowledge Reid had was known to the plaintiff in error, but he made no application for a continuance on account of the absence of this witness to enable the plaintiff in error to find and produce him at the trial. The affidavit of Mercurio shows some effort for this purpose, but even if this effort be regarded as sufficient diligence to excuse the failure to produce the witness or to apply for a continuance, the testimony itself was merely cumulative and far from conclusive. Where the evidence is contradictory and a reviewing court has a different view from the trial court in regard to its weight but not sufficient to grant a new trial on that ground, if newly discovered evidence, not cumulative in regard to the particular point to which it relates, presented in affidavits submitted on the motion for a new trial, strengthens the conviction of the court that the ends of justice require a further examination of the case a new trial will be granted. (*Wilder*

v. *Greenlee,* 49 Ill. 253; *Cairo and St. Louis Railroad Co.* v. *Schumacker,* 77 id. 583; *People* v. *Wright,* 287 id. 580.) This case is not of that character. We see no reason for reaching a different conclusion from that of the trial judge as to the weight of the evidence. The supposed newly discovered evidence is merely cumulative, is not conclusive and would not probably produce a different verdict.

The judgment of the criminal court is affirmed.

*Judgment affirmed.*